Argued April 23, reversed September 17,
reconsideration denied November 15, 1979
petition for review denied January 22, 1980 (288 Or 493)

STILL, et ux,
*Appellants,*
*v.*
BOARD OF COUNTY COMMISSIONERS
OF MARION COUNTY, et al,
*Respondents.*

(No. 106035, CA 11977)

600 P2d 433

Robert E. Stacey, Jr., Portland, argued the cause for appellants. With him on the briefs was Richard C. Stein, Salem.

Bruce W. Williams, Salem, argued the cause for respondents. With him on the brief were Dennis J. Graves, Williams, Spooner & Graves, P.C., and Frank C. McKinney, Marion County Legal Counsel, Salem.

Before Schwab, Chief Judge, and Tanzer and Richardson, Judges.

TANZER, J.

## TANZER, J.

Plaintiffs in this writ of review proceeding appeal from an order of the circuit court affirming the Board of Commissioners' approval of a proposed subdivision. We reverse and remand because several of the Board's findings and conclusions misconstrue the applicable law or are not supported by substantial evidence. ORS 34.040(3), (4).

The proposed development would subdivide a 99-acre parcel of rural land (Drury parcel) into 30 lots of various sizes. The property is located nine miles from the center of the city of Salem, 3.7 miles from the city limits, and approximately 2.5 miles outside the urban growth boundary. The parcel is woodland except for 18 acres which have been cleared. It has not been farmed profitably for at least 40 years.

We review the Board's decision in the context of statewide planning Goals #2 and #3. The Drury parcel lies outside the urban growth boundary and is composed of Class III and IV soils according to the Soil Capability Classification System of the United States Soil Conservation Service; therefore, it is agricultural land within the definition of Goal #3 of the statewide planning goals, OAR 660-15-000.[1] Goal #3 mandates the preservation of such land for agricultural use.

A threshold analytical difficulty arises from the failure of the order to specify whether the order allowing the subdivision was based on ORS 215.213(3), which allows nonfarm residential use of agricultural land under certain conditions, or whether the Board allowed the subdivision as an exception under Goal #2, the exception procedure established for local government to follow when it is not possible to apply

---

[1] The evidence showed only the soil classification of the cleared portion of the property, but the Board treated the entire parcel as Class III and IV soils and therefore subject to Goal #3.

an appropriate goal to a specific parcel of land.[2] The phraseology of the order implies that the drafters attempted to touch both bases, but they successfully covered neither. The order addresses aspects of both, but it does not comply with all the requirements of either the statute or of Goal #2.

## I. ORS 215.213(3)

Nonfarm residential use of agricultural land is permitted if each of the conditions listed in ORS 215.213(3) is found to exist. ORS 215.213(3) provides:

"(3) Single-family residential dwellings, not provided in conjunction with farm use, may be established, subject to approval of the governing body or its designate in any area zoned for exclusive farm use upon a finding that each such proposed dwelling:

"(a) Is compatible with farm uses described in subsection (2) of ORS 215.203 and is consistent with the intent and purposes set forth in ORS 215.243; and

"(b) Does not interfere seriously with accepted farming practices, as defined in paragraph (c) of subsection (2) of ORS 215.203, on adjacent lands devoted to farm use; and

"(c) Does not materially alter the stability of the overall land use pattern of the area; and

"(d) Is situated upon generally unsuitable land for the production of farm crops and livestock, considering the terrain, adverse soil or land conditions, drainage and flooding, vegetation, location and size of the tract; and

"(e) Complies with such other conditions as the governing body or its designate considers necessary."

■ The Board addressed several of the statutorily requisite conditions. It concluded that nonfarm residential use of the land is compatible with farm uses in that it did not interfere with the use of nearby

---

[2] This case is distinguishable from *Meeker v. Board of Comm'rs*, 36 Or App 699, 585 P2d 1138 (1978), *rev allowed* (1979). There we considered an application of Goal #3 to marginal agricultural land which purported to maximize farm use, whereas here the order authorizes nonfarm use. *See also* the denial of the petition for review in *1000 Friends v. Benton County*, 32 Or App 413, 575 P2d 657, *rev den* 284 Or 41, 584 P2d 1371 (1978).

farmland. It also found that it would not interfere seriously with farming practices on adjacent farmlands. The Board concluded that the land was generally unsuitable for agriculture, based on its history and upon conflicting evidence regarding grape cultivation. There was a separate finding, however, that the land was suitable for growing hay, but the Board made no finding as to whether hay could be grown for profit by a reasonable farmer. Hence, the conclusion regarding agricultural suitability is inconsistent with the finding regarding hay and subsection (d) is not satisfied.

The obvious void in the order, if it purports to be under ORS 215.213(3), is the absence of consideration of whether the subdivision "is consistent with the intent and purposes set forth in ORS 215.243" as required by subsection (a). ORS 215.243 provides:

"The Legislative Assembly finds and declares that:

"(1) Open land used for agricultural use is an efficient means of conserving natural resources that constitute an important physical, social, aesthetic and economic asset to all of the people of this state, whether living in rural, urban or metropolitan areas of the state.

"(2) The preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources and the preservation of such land in large blocks is necessary in maintaining the agricultural economy of the state and for the assurance of adequate healthful and nutritious food for the people of this state and nation.

"(3) Expansion of urban development into rural areas is a matter of public concern because of the unnecessary increases in costs of community services, conflicts between farm and urban activities and the loss of open space and natural beauty around urban centers occurring as the result of such expansion.

"(4) Exclusive farm use zoning as provided by law, substantially limits alternatives to the use of rural

land and, with the importance of rural lands to the public, justifies incentives and privileges offered to encourage owners of rural lands to hold such lands in exclusive farm use zones."

██ It may be economically unfeasible to farm a piece of land in an exclusive farm use zone and residential use of it may not interfere with farming in the area, but residential use may nevertheless offend Oregon's land use policy as declared in ORS 215.243. It is therefore necessary in the application of ORS 215.213(3) to consider the policy ramifications of the proposed non-farm residential use. The order makes no reference whatever to the policy issues which the Board is required to consider if it acts under this statute. For this reason at least, the order is legally insufficient to authorize the subdivision under ORS 215.213(3).

## II. Goal #2

Next, we consider the validity of the order as it purports to create an exception to the application of Goal #3 by resort to the Goal #2 exception procedure. The Board's reasoning and conclusions in this regard rest largely on its findings that the subject parcel is committed to residential development and that there is a need for the type of development planned for the subject property:

"There are several subdivisions in the immediate vicinity, and adjacent to, the proposed subdivision. These developments include Riversprings Subdivision, Melgard Sunset View Estates, Whitecloud Estates, and Chinook Subdivision; taken together, these existing developments present an unbroken area which is committed to development extending over a distance of approximately 3 1/2 miles. All of these existing developments are approximately the same distance from the Salem city limits as is the proposed development.

"* * * * *

"Testimony indicates there is a need for the type of single-family residence lots the appellant proposes. This need is demonstrated by a scarcity of similar lots, as indicated by the price of similar lots, and the

[120]

unavailability of similar lots on the market. The proposed development would have the additional attraction of providing privacy and a scenic view. The development would also provide competition for other similar developments."

Based on these findings and others, the Board reached the following conclusions regarding the application of Goal #3 to the proposed subdivision:

"The subject property contains Class III and IV soils, which mandates consideration of whether the property should be preserved for agricultural purposes. However, consideration of other factors including the requirements enumerated in Goal 2 (relating to Goal exceptions), indicates the proposed development is appropriate, notwithstanding the presence of Class III and IV soils. These considerations are as follows:

"(1)   Considering the location and density of the proposed use, and similar uses currently existing in the area, the development would be compatible with the surrounding uses, including agriculture.

"(2)   A need exists in Marion County for the type of development proposed.

"(3)   The location is suited for the proposed use, since it is generally unsuited for agriculture and is desirable as a housing location. Since similar density housing exists in the area and the area is generally committed to such housing, the subject property is better adapted to the proposed use than would be similar property in the Salem area which is not in an area committed to rural residential housing.

"(4)   Approval of the proposed development would not set a precedent which would undermine the effectiveness of the Agricultural Goal since the combined circumstances of general unsuitability for agriculture commits this location to rural residential use.

"Testimony indicates that subject property is not now suitable for farm use and that it is not capable *now or in the future* of being effectively employed for agricultural purposes. All of these considerations indicate the proposed development is appropriate for the area."

[121]

The pertinent portion of Goal #2 provides:

"* * * If the exception to the goal is adopted, then the compelling reasons and facts for that conclusion shall be completely set forth in the [comprehensive] plan and shall include:

(a) Why these other uses should be provided for;

(b) What alternative locations within the area could be used for the proposed uses;

(c) What are the long term environmental, economic, social and energy consequences to the locality, the region or the state from not applying the goal or permitting the alternative use;

(d) A finding that the proposed uses will be compatible with other adjacent uses."

The findings required by Goal #2 may conveniently be summarized as (1) need, (2) alternatives, (3) consequences, and (4) compatibility. *See* LCDC Publication, Common Questions About the Exceptions Process, 3-4 (May 9, 1979).

1. *Need*

■ The Board's conclusion that there is a need for the proposed development in Marion County is based on its finding that there is a scarcity of similar lots, as indicated by the price and small number of similar lots on the market. This correctly summarizes the evidence, which shows that there is a market for residential lots of the kind in the proposed subdivision. A market demand for rural residential development, however, does not constitute a "need" for it, as that word is used in Goal #2. Goal #3 was enacted to preserve agricultural land from encroachment by urban and suburban sprawl by subordinating the free play of the marketplace to broader public policy objectives. Land is not excepted from the agricultural goal merely because somebody wants to buy it for a house.

A determination of whether this land is needed for residences should be made in accordance with Goal #10, housing, which mandates that local governments

should designate sufficient suitable land within the urban growth boundary to meet residential needs. There is no showing in the record that no suitable land is available inside the urban growth boundary for residential use. The Board's finding regarding need misconstrues the applicable legal standard and is not supported by substantial evidence.

2. *Alternatives*

■ Regarding alternatives to the proposed subdivision, the Board concluded:

> "Since similar density housing exists in the area and the area is generally committed to such housing, the subject property is better adapted to the proposed use than would be similar property in the Salem area which is not in an area committed to rural residential housing."

There are two flaws in this conclusion. First, the finding of commitment is not supported by substantial evidence. The evidence shows that there are several subdivisions in a broad strip of land extending approximately three-and-a-half miles. One of the subdivisions is located on a 700-acre parcel contiguous to the Drury property. The record does not indicate whether that subdivision itself is contiguous to the Drury property. Other contiguous property, and other land near the other subdivisions, has not been subdivided.

■ A finding that agricultural land is "committed" to residential use must be based on something more than

a continuation of a peninsular growth trend in the vicinity; the evidence must demonstrate that it is "not possible to apply the appropriate goal" to the specific property; Goal #2, OAR 660-15-000. The evidence does not support the conclusion that the Drury property is committed to residential use, because nothing in the record establishes that the existence of nearby subdivisons would prevent use of the subject parcel for agricultural purposes. Indeed, for all the record shows, the nearby subdivisions may themselves be examples

of incremental usurpation of farmland which the goals were established to halt and prevent.

■ Second, as we observed in the preceding section, the Board's order does not reflect an adequate survey of alternative parcels for housing, especially within the urban growth boundary. Its conclusory statement that this parcel is better suited to the proposed use than other property in the Salem area is not supported by any discussion in the record of other specific sites which were considered. *Cf. Neuberger v. City of Portland*, 37 Or App 13, 20-22, 586 P2d 351 (1978) *rev allowed* (1979).

3. *Consequences*

The "long term environmental, economic, social and energy consequences" of the exception simply are not addressed by the order as required by subsection (c) of Goal #2.[3]

■ Because two of the Board's conclusions justifying an exception to Goal #3 are not supported by substantial evidence or misconstrue applicable legal standards, and because long-term consequences are not addressed at all, the order affirming its approval of the subdivision cannot be sustained under the Goal #2 exceptions procedure. Accordingly, the order is reversed. ORS 34.040(3), (4).

Reversed.[4]

---

[3] In light of our consideration of the first three required findings, we need not and do not reach the fourth. Nor do we reach plaintiffs' arguments regarding amendment of the Marion County Comprehensive Plan, for that situation is fluid and can be addressed in the event of a new application.

[4] Plaintiffs' assignment of error regarding the unusual award of costs is now moot.