Argued and submitted October 26, 1981, affirmed June 9,
reconsideration allowed; former opinion adhered to; affirmed
(60 Or App 356, 653 P2d 1017) November 24, 1982,
petition for review denied February 8, 1983 (294 Or 492)

STEWART et al,
*Petitioners,*

*v.*

CITY OF EUGENE,
*Respondent.*

(No. 80-050, CA A20533)

646 P2d 74

Michael E. Farthing, Eugene, argued the cause for petitioners L. L. Stewart, et al. With him on the brief were Richard E. Miller and Hershner, Hunter, Miller, Moulton & Andrews, Eugene, for petitioners Junction City and Junction City School District No. 69, and William A. Van Vactor, Lane County Legal Counsel, attorney for petitioner Lane County.

Timothy J. Sercombe, Eugene, argued the cause for respondent. With him on the brief was Johnson, Harrang & Swanson, Eugene.

Before Gillette, Presiding Judge, Joseph, Chief Judge,* and Young, Judge.

GILLETTE, P. J.

---

\* Joseph, C.J., *vice* Roberts, J.

## GILLETTE, P. J.

This appeal by Lane County and several other parties challenges a final order of the Land Use Board of Appeals (LUBA) remanding to Lane County an ordinance that amended the Willamette-Long Tom Subarea comprehensive plan. The amendment changed the designation of a particular tract of land, formerly classified partly as "Agriculture" and partly as "Agriculture/Industrial Reserve," to "Special Industrial." The tract consists of approximately 1800 acres, located between Eugene and Junction City along U.S. Highway 99. The final order was based upon approval by the Land Conservation and Development Commission (LCDC) of a preliminary determination by LUBA that the county had failed to provide sufficient reasons and facts to justify a Goal 2 exception to Goal 3 (Agriculture) in adopting the ordinance. We affirm.

The relevant facts are summarized in LUBA's opinion:

"The 'Industrial Triangle' (Triangle) is an area of land located northwest of the city limits of Eugene and is bordered by the Main Branch of the Southern Pacific Rail Lines on the east, the Oregon Electric Rail Lines (operated by Burlington Northern) on the west, Aubrey Lane on the south and northern lines of Section 8, Township 16 South, Range 4 West W.M. on the north. The Triangle includes approximately 1800 acres, is comprised of numerous ownerships and contains parcels ranging in size from one acre to 720 acres. The present use of the site is predominately agricultural, although there are scattered residential and industrial uses. In 1966, as part of an overall zoning effort, the above described lands were zoned for industrial purposes. In 1976, the Willamette-Long Tom Subarea Plan was adopted by the Lane County Board of Commissioners. The Plan designated the entire area as agriculture but recognized the industrial potential of the northern most and southern most segments of the Triangle by designating them agriculture/industrial.

"On March 14, 1978, the Lane Planning Commission held a public hearing on a proposal to rezone the Triangle area and recommended that the area be rezoned to exclusive farm use to comply with the planned land use designation of the area. The matter then went to the Board of Commissioners which on April 16, 1978 continued the

proposed rezoning and directed the Planning Commission to initiate a plan amendment for the entire Triangle area, to redesignate it as 'Industrial.' On June 12, 1979, the Lane County Planning Commission held a special public hearing to consider the requested amendment. On August 21, 1979, the Planning Commission approved preliminary findings of fact and conclusions of law in support of its recommendation that an amendment be adopted.

"The Planning Commission's recommendation and supporting documents were forwarded to the Lane County Board of Commissioners, which held a public hearing in Junction City on December 13, 1979, to consider the amendment proposal. On January 15, 1980, the Board tentatively approved the plan amendment and directed its Planning Staff and Legal Counsel to draft a plan amendment ordinance, supporting findings of fact and conclusions of law, an exception to Goal 3 and an industrial zoning ordinance that would encourage retention of large parcels within the Triangle and permit interim farming and special light manufacturing uses. On April 2, 1980, the contested ordinance was passed.

"Under the terms of the special industrial district established by the ordinance, development is not allowed until zoning provisions governing the use are implemented. Under the zoning provisions, each development proposal will be evaluated on its own merits and must meet specific standards before a permit will be issued. Until that time the property is to remain in its current designation, Agriculture or Agricultural/Industrial Reserve and may only be put to the uses allowed under an EFU-20 designation. The industrial designation allows for uses similar to those presently allowed in zoning districts M-1, M-2 and M-3 (light to heavy industry designations).

"It appears that if fully developed under the special industrial designation the 1800 acre Triangle area could provide employment for between 18,000 and 45,000 workers. No specific companies are slated for immediate use of the property, but indications are that high technology, low polluting type industries are what Lane County desires to have locate within the Triangle.

"The Triangle contains a variety of Class I-IV soils but according to the findings of Respondent Lane County, the predominant soil types are Class IIw and Class IVw. Both classes are wet soils and experience varying degrees of drainage problems. The agricultural uses of the land

within the Triangle are primarily grass seed production and winter pasture for sheep. Most land in the Triangle is presently harvested nine out of every ten years.

"The Triangle is served by many forms of transporation. It is in the area of Mahlon Sweet Airport, is bordered on two sides by railroad tracks and is served by U.S. Highway 99 which is in the process of being expanded to four lanes from just north of the Eugene city limits to Junction City."

LUBA held that Lane County, in adopting the comprehensive plan amendment, did not properly adopt a Goal 2 exception to Goal 3, which applies to agricultural land. Specifically, LUBA concluded that the land in question did not qualify as a "site specific resource"[1] that would be appropriate for designation beyond the Eugene-Springfield urban growth boundary. LCDC adopted LUBA's proposed order as its own, and this final order of LUBA followed.

Petitioners first challenge the city's standing to seek review of this Lane County land use action with LUBA. They argue that the city did not establish that it had been "adversely affected or aggrieved," as required by Or Laws 1979, ch 772, §§ 4(1), (2) and 6(a).[2]

■ The city alleged, in its petition to LUBA, that it had appeared in the proceedings below in opposition to the proposed action and that:

"[t]he action under review has significant impact on property within the City of Eugene, and long-term effects upon comprehensive planning for the urban area. The inter-relationship of city and county land use planning and the proximity of the city's boundaries to the subject property give the city standing * * *."

---

[1] The use of this non-statutory term is explained more fully in n 8, *post.*

[2] Or Laws 1979, ch 772, § 4(3) provide:

"(3) Any person who has filed a notice of intent to appeal as provided in subsection (4) of this section may petition the board for review of a quasi-judicial land use decision if the person:

"(a) Appeared before the city, county or special district governing body or state agency orally or in writing; and

"(b) Was a person entitled as to right to notice and hearing prior to the decision to be reviewed or was a person whose interests are adversely affected or who was aggrieved by the decision."

In *Ruegg v. Clackamas County,* 32 Or App 77, 573 P2d 740 (1978), this court upheld a municipality's standing in a writ of review proceeding in which the standard was an "injury of substantial right." ORS 34.040. We stated:

"In view of the inter-relationship between the county's and city's land use planning, the proximity of the city's boundaries to the subject property, and the trend in the law to extend standing in land use cases to persons other than those who own contiguous property * * * the city should have been permitted to appear as a party in this proceeding." 32 Or App at 80.

Similarly, we conclude here that the inevitable inter-relationship between the city's and county's land use planning and the undisputed fact that the area involved here borders on the city limits of Eugene combine to confer standing upon the city. *See also 1000 Friends v. Multnomah County,* 39 Or App 917, 593 P2d 1171 (1979).

Petitioners' second assignment of error is that LUBA's proposed final order and its subsequent affirmation by LCDC are not supported by substantial evidence in the record. They specifically argue that LCDC's determination is defective, because: 1) it does not state either that all of LCDC's members received a copy of LUBA's recommendations and the parties' exceptions thereto or that four or more of LCDC's members concurred in the determination; and 2) LCDC did not itself consider any part of the record upon which the county based its approval of the plan amendment, but instead accepted LUBA's review of that record.

Challenges to the validity of land use actions on the basis of violation of the statewide planning goals are finally determined by LCDC, following recommendation by LUBA. Or Laws 1979, ch 772, § 6(4),[3] in effect at the time of this proceeding, provided as preconditions to the validity of an LCDC determination that the Commission receive LUBA's recommendation and that at least four members of the commission concur in the determination. Petitioners argue that error was committed here, because LCDC's order does not state affirmatively and explicitly that these

---

[3] Or Laws 1979, ch 772, § 6 was reenacted, as amended, by Or Laws 1981, ch 748, § 36a.

two conditions were satisfied. At the same time, petitioners do not provide us any reason to believe that the conditions were not met.

■ Former ORS 41.360(15), in effect at the time of this litigation, created a disputable presumption that "[o]fficial duty has been regularly performed."[4] There is also a strong common law presumption of regularity of administrative action. *State ex rel v. Duncan,* 191 Or 475, 498, 230 P2d 773 (1951). LUBA is required by statute to transmit its recommendation to LCDC. Or Laws 1979, ch 772, § 6(1). Four votes of the commission are required to issue a determination such as the one LCDC issued in this case. Or Laws 1979, ch 772, § 6(4). Absent any evidence to the contrary, under former ORS 41.360(15) we presume that these duties were performed.[5] If petitioners were aware that a procedural irregularity such as that suggested here had actually occurred, and the record did not show it, there was a statutory procedure they could have used to settle the matter. *See* ORS 183.482(7).

Petitioners also assign error to LCDC's failure to review independently the entire Lane County record and to issue independent findings and conclusions. Section 6(1) of Oregon Laws 1979, chapter 772 authorizes LUBA to prepare and submit recommendations to LCDC concerning any allegations of violations of the state-wide planning goals contained in a petition. Any such recommendation is to include a general summary of the evidence contained in the record, proposed findings of fact and conclusions of law and a recommendation of whether LCDC should hear oral argument. Section 6(2) provides each party with an opportunity to submit written exceptions to LUBA's recommendation.

■ On receipt of LUBA's recommendation, LCDC is authorized to "review the recommendation of the board and any exceptions filed thereto." Section 6(3) states:

---

[4] ORS 41.360 was repealed by Or Laws 1981, ch 892, § 98.

[5] The City of Eugene made a motion to this court to supplement the record by adding the minutes of the LCDC meeting of February 12, 1981, during which it considered LUBA's recommendation in this case. The stated reason for the motion was to show that four members of LCDC concurred in its decision. The motion was denied.

"(3) The commission shall review the recommendation of the board and any exceptions filed thereto. The commission shall allow the parties an opportunity to present oral argument to the commission unless the board recommends that oral argument not be allowed and the commission concurs with the board's recommendation. *The commission shall be bound by any finding of fact of the city, county, special district or state agency for which there is substantial evidence in the record.* The commission shall issue its determination on the recommendation of the board and return the determination to the board for inclusion in the board's order under section 5 of this 1979 Act within such time as is necessary to allow the board to prepare and issue a final order in compliance with the requirements of section 4 of this 1979 Act. If additional time is required, the commission shall obtain the consent of the parties for a postponement." (Emphasis supplied.)

Petitioners apparently suggest that the statutory language indicating that LCDC is bound by any finding of fact for which there is substantial evidence in the record effectively requires LCDC to reconsider the entire record. We do not agree. Nothing in that section suggests that LCDC is required to duplicate the process, already followed by LUBA, of reviewing the entire record of the proceedings below. LCDC's role is obviously that of regulating land use policy through review of LUBA's preliminary determinations on goal issues, not through a second plenary consideration of the matter.

The question remains as to what the emphasized language of Section 6(3) *does* mean. It could mean either (1) that LUBA's findings of fact are *binding* on LCDC, and so the commission's review is restricted to a determination of whether the facts as found support LUBA's recommendation, or (2) that, under appropriate circumstances, LCDC may review portions of the record before LUBA, where its own review requires it.

We think the second formulation is the one intended by the legislature. Section 6(1) requires LUBA to submit its recommended order concerning goal violations, "* * * includ[ing] a general summary of the evidence contained in the record and proposed findings of fact * * *." Section 6(2) allows any party to take exception in writing

to the board's recommendation." Because the "recommendation" must include, where appropriate, both an evidentiary summary and proposed findings of fact, we think it clear that an exception may be taken to either. We think it equally clear that no adequate consideration by LCDC of the exception is possible unless it calls for and examines those portions of the record before LUBA which relate to the exceptions taken, when a substantial evidence issue is presented. We so construe the statute.[6]

Petitioners argue next that LUBA's findings are not sufficient to support LCDC's determination because LUBA's findings are not supported by substantial evidence in the record. LUBA's decision considered whether the county made sufficient findings as to four factors: needs, alternatives, consequences and compatibility with adjacent uses.[7] Petitioners' assignment of error attacks LUBA's conclusions only as to the *need* for the proposed exception. Petitioners argue that:

"* * * LUBA's finding is really a conclusion for which absolutely no support, grounds or authority is cited. * * * That is not much of an analysis and certainy does not contradict Lane County's factual support for its plan amendment."

They go on to point out that the record

---

[6] There is no claim made here that the exceptions taken required this more limited review.

[7] The pertinent portion of Goal 2 Provides:

"* * * If the exception to the goal is adopted, then the compelling reasons and facts for that conclusion shall be completely set forth in the [comprehensive] plan and shall include:

"(a) Why these other uses should be provided for;

"(b) What alternative locations within the area could be used for the proposed uses;

"(c) What are the long term environmental, economic, social and energy consequences to the locality, the region or the state from not applying the goal or permitting the alternative use;

"(d) A finding that the proposed uses will be compatible with other adjacent uses."

*See also* LCDC Publication, Common Questions About the Exceptions Process, 3-4 (May 9, 1979); *Still v. Board of County Commissioners,* 42 Or App 115, 122, 600 P2d 433 (1979).

"* * * included findings [by Lane County] that the Triangle must be farmed as if it were composed entirely of Class IV wet soils, that the Triangle is bordered by parallel main rail lines (as opposed to branch lines like the single line running through Eugene's West 11th industrial area), that the Triangle is bordered by a four-lane highway that has direct access to the interstate system, that Oregon's second largest airport is several thousand feet away from the Triangle, that Lane County and the Eugene-Springfield area has a shortage of large industrially-zoned parcels and that this area is immediately adjacent to the residential communities of River Road/Santa Clara and Bethel-Danebo. * * *"

LUBA concluded, however, that the county could not justify designating the triangle as a "site specific resource" merely because of a confluence of rail facilities, a highway and an airport. LUBA stated:

"The type of 'rural resources' relied on by respondent to justify its decision, i.e., confluence of rail facilities, a highway and an airport, makes a mockery of the site specific resource concept and results in diminution in agriculture land protections provided by urban growth boundaries. Much of the agricultural land in Oregon is criss-crossed by highways and rail lines. To accept respondent's reasoning that those factors should be enough to justify conversion of agricultural land to industrial use, would, in effect, open Pandora's box to the furtherance of urban sprawl throughout Oregon's agricultural land."

■ LUBA's conclusions as to need were based both on the reasoning indicated above—that the confluence of rail facilities, a highway and an airport was not sufficient to justify designation of the land as a site specific resource[8]

---

[8] LUBA's focus on the "site specific resource" concept derives from a suggested analysis of the need factor found in a policy paper published by the Department of Economic Development entitled, "Economic Development Planning for Rural and Resource Lands Through the Comprehensive Plan and Ordinances," August 25, 1980, page 16. It states:

"* * * Compelling reasons why a rural industrial use should be provided for might include:

"1. The activity is significantly dependent upon a *unique site specific resource* located within Agriculture or Forest Lands, such as a geothermal well, mineral or aggregate deposite, water reservoir, natural feature (valued by tourist or for distination, [sic] recreation), river port, airport or rail facilities." (Emphasis supplied).

The phrase is not statutory, but all the parties appear to agree that it is an appropriate and useful analytical tool in cases of this kind.

and on the ground that the county made no finding as to why an 1800-acre tract was *required* here. As to this second ground, LUBA pointed out that "[t]he site appears to derive its borders and, therefore, its size from the location of railroad tracks and not from any need for a specific amount of land."

There is some validity to petitioners' argument that LUBA's rejection of the county's site specific conclusion should have been supported by a more detailed analysis. While LUBA's point that it is not unusual for agricultural areas to be near such transportation facilities may be well taken, certain circumstances, such as a particular arrangement of such facilities in an agricultural area would go far toward justifying a site specific designation. However, LUBA also relied upon the fact that the record did not justify the choice of 1800 acres of agricultural land, rather than of some other quantity. The failure to show need for the *quantity* of land chosen, combined with LUBA's findings as to the remaining three factors, which petitioners do not specifically contest, adequately support LUBA's decision to remand.

In their third assignment of error, petitioners argue that LUBA failed to consider the *legislative character* of Lane County's plan amendment and that it failed to apply different burdens of proof depending on the degree of change resulting from the plan amendment. Petitioners contend that the plan amendment was *legislative* in character, as opposed to *quasi-judicial,* because it "affects a large area (1800 acres), involves numerous ownerships, was initiated by the Board of Commissioners and involves establishment and implementation of county policy for the economic development of central Lane County." Petitioners argue that the courts, LCDC and LUBA "should exercise some degree of restraint in overturning a local decision" that is legislative in nature.

Although our courts have devoted a great deal of time to determining whether land use decisions, usually zone changes, are *legislative* or *quasi-judicial,* [9] it is not

---

[9] *See Petersen v. Klamath Falls,* 279 Or 249, 255-56, 566 P2d 1193 (1977), where the court stated:

necessary for us to do so in this case. The standard of review to be applied here is provided in Or Laws 1979, ch 772, § 5(4)(a):[10]

"(4) The board shall reverse or remand the land use decision under review only if:

"(a) The board finds that the city, county or special district governing body:

"* * * * *

"(c) Made a decision that was not supported by substantial evidence in the whole record;

"* * * * *."

Recently, in *Lima v. Jackson County,* 56 Or App 619, 643 P2d 355 (1982), we held that section 5(4)(a), (c) does not require parcel-specific evidence or findings in the comprehensive planning process and does not provide for substantial evidence review by LUBA of the designation of specific parcels by a comprehensive plan. In reaching that conclusion, we stated that section 5(4)(a), (c) "authorizes LUBA to reverse or remand a decision which is not supported by *substantial* evidence only if there is a requirement from sources outside the Act that there *be* evidence." 56 Or App at 625. (Emphasis in original.)

■ In this case, unlike in *Lima,* Lane County justified its decision by *a Goal 2 exception* to Goal 3. To adopt such an exception, the local governing body is required to *make findings.* Goal 2, part II, states, in relevant part:

"If the exception to the goal is adopted, then *the compelling reasons and facts for that conclusion shall be completely set forth in the plan* * * *

"* * * * *." (Emphasis supplied.)

_____

"* * * since the consideration of these statewide goals and the determination that a particular annexation proposal does or does not comply with those goals necessarily involves the application of general standards to a specific situation and to specific individuals, we conclude that such a situation is quasi-judicial in nature. * * *"

*See also Neuberger v. City of Portland,* 288 Or 155, 603 P2d 771 (1980); *Fifth Avenue Corp. v. Washington County,* 282 Or 591, 616-18, 581 P2d 50 (1978) (and cases cited therein); *Fasano v. Washington County,* 264 Or 574, 507 P2d 23 (1973).

[10] Or Laws 1979, ch 772, § 5 was reenacted, as amended, by Or Laws 1981, ch 748, § 36.

Goal 2 itself requires the local body to set forth reasons and facts supporting its conclusions. That requirement would be meaningless if those conclusions were not subject to substantial evidence review by LUBA.

Petitioners also argue that a "variable" burden of proof was appropriate: part of the land involved here had been designated in Lane County's unacknowledged comprehensive plan as "Agriculture," while the remainder of the land was designated "Agriculture/Industrial Reserve." The contested plan amendment changed the designation of the entire parcel to "special industrial." Petitioners cite the following passage from *Fasano v. Bd. of Comm'rs,* 264 Or 574, 507 P2d 23 (1973):

> "Because the action of the commission in this instance is an exercise of judicial authority, the burden of proof should be placed, as is usual in judicial proceedings upon the one seeking change. *The more drastic the change, the greater will be the burden* of showing that it is in conformance with the comprehensive plan as implemented by the ordinance, that there is a public need for the kind of change in question, and that the need is best met by the proposal under consideration. *As the degree of change increases, the burden of showing that the potential impact upon the area in question was carefully considered and weighed will also increase."* 264 Or at 586. (Emphasis supplied.)

From the foregoing, petitioners argue:

> "LUBA should have applied a different, less stringent burden of proof in evaluating the grounds and evidence supporting the plan amendment for the areas designated 'Agriculture/Industrial Reserve'."

Respondent correctly points out that the "change" emphasized in *Fasano* was relative to an existing, valid zoning designation. The distinction is dispositive. Here, the existing designations were merely pronouncements of the county and had not been validated through acknowledgement by LCDC. LUBA was not required to apply a less stringent standard of proof to part of the parcel merely because the county once designated it as "Agriculture/ Industrial Reserve" rather than "Agriculture."

Petitioners also claim that neither LUBA nor LCDC gave adequate consideration to petitioners'

substantial compliance with the Department of Economic Development's (DED) policy paper for rural economic development.[11] They point out that LCDC reviewed that policy paper and found it to be "generally consistent with Commission policy." Respondent argues that LUBA essentially addressed the issue raised in the paper without specifically citing it.

■ Although we agree with respondent's claim that LUBA addressed those issues, we need not rely on that conclusion here. The DED paper was not an administrative rule adopted by LUBA; neither was it formally issued as an LCDC position paper. LUBA is not obligated to comply with the guidelines established by DED. LCDC's conclusion that the paper was "generally consistent" with commission policy certainly does not oblige LUBA to address the paper expressly in all cases to which it is arguably relevant.

■ In their final assignment of error, in addition to repeating arguments made earlier in their brief, petitioners argue that LCDC erred in failing to adopt sufficient criteria for evaluating exceptions. They refer to Or Laws 1979, ch 772, §§ 4(7) and 6(3), which provide that LUBA and LCDC are "bound by any finding of fact of the [governing body] for which there is substantial evidence in the record." They then refer us to LCDC's policy paper on the exceptions process, which states that, "in general," exceptions will be upheld by LCDC if (1) they are supported by "adequate and accurate findings of fact," and (2) procedures were followed which provide "adequate opportunity for citizens and affected governmental units to be involved." Petitioners argue that LCDC has not expressly stated "when such an exception will not be upheld when, as in this case, the criteria have been thoroughly addressed and considered by the Lane County Commissioners." In essence, petitioners argue that LCDC has failed to provide sufficient standards for evaluating exceptions to statewide goals.

Respondent points to *Board of Medical Examiners v. Mintz,* 233 Or 441, 447, 378 P2d 945 (1963), where the court stated:

---

[11] N 5, *supra.*

"No matter how specific the standard or standards are stated, there is almost always a penumbra which requires the administrative agency to exercise a judgment as to whether the facts before it fall within or outside the legislative design."

In *Sun Ray Dairy v. OLCC,* 16 Or App 63, 73, 517 P2d 289 (1973), we stated:

"We do not require the impossible. We require that the agency formulate and publish the broad bases upon which decisions * * * will be made."

Respondent further argues that "the broad bases of LCDC administrative discretion in reviewing a goal exception is contained in the goal, the guidelines, position papers and prior LCDC and LUBA decisions." We agree. Goal 2 expressly provides criteria for taking exceptions to planning goals. For us to demand more would be to require the impossible. *See also McPherson v. Emp. Div.,* 285 Or 541, 591 P2d 1381 (1979); *Springfield Ed. Assn. v. Springfield School Dist.,* 290 Or 217, 621 P2d 547 (1980).

We affirm LUBA's final order remanding respondent Lane County's decision to amend its comprehensive plan.