Argued and submitted November 29, 2005, on petition, remanded for reconsideration of scope of LUBA's remand to county regarding Goal 3 and OAR 660-033-0020(1)(a)(B); otherwise affirmed; on cross-petition, affirmed March 22, petition for review allowed June 20, 2006 (341 Or 140)

Shelley WETHERELL,
Janell Stradtner
and Friends of Douglas County,
*Respondents - Cross-Petitioners,*

*v.*

DOUGLAS COUNTY,
*Respondent,*

*and*

GREAT AMERICAN PROPERTIES
LIMITED PARTNERSHIP,
*Petitioner - Cross-Respondent.*

2005-045; A129999

132 P3d 41

Stephen Mountainspring argued the cause for petitioner - cross-respondent. With him on the briefs was Dole, Coalwell, Clark, Mountainspring, Mornarich & Aitken, P.C.

Ann V. Wolf argued the cause for respondents - cross-petitioners. With her on the brief was Christine M. Cook.

No appearance for respondent Douglas County.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General, filed the brief *amicus curiae* for Department of Land Conservation and Development.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Petitioner Great American Properties Limited Partnership seeks judicial review of a Land Use Board of Appeals (LUBA) order that remanded to Douglas County to reconsider its determination that a 162-acre parcel was neither agricultural land nor forestland subject to statewide planning Goals 3 and 4. Petitioner argues, principally, that LUBA, in remanding, erroneously applied OAR 660-033-0030(5), which, petitioner asserts, is invalid because it conflicts with Goal 3. In their cross-petition, respondents/cross-petitioners Wetherell, Stradtner, and Friends of Douglas County (collectively "Friends") assert that LUBA erred in determining that the subject property was not part of a "farm unit" or "necessary to permit farm practices" on adjacent or nearby agricultural lands. OAR 660-033-0020(1)(a)(C) and (1)(b).[1] For the reasons set forth below, we conclude that OAR 660-033-0030(5) is invalid; consequently, we remand to LUBA to modify the scope of its remand to the county regarding Goal 3 compliance. We reject, without discussion, petitioner's second assignment of error, challenging LUBA's ruling regarding Goal 4 compliance, as well as the assignments of error raised in Friends' cross-petition.

The basic facts are not in dispute. The subject property is designated in the Douglas County comprehensive plan as "farm forest transitional" and is zoned for "exclusive farm use-grazing." Until recently, the subject property was part of a larger ranch and had been used for grazing livestock for approximately 70 years. In 1996, some logging was conducted on the property. In 2000, the owner sold the other part of the ranch—the more productive portion—to an individual who grew hay on it. The property at issue here remained in use as pasture. Throughout the past 20 years or so, the productivity of the subject property has declined due to overgrazing and lack of weed control and brush clearing. At the time that petitioner acquired the property in 2003, the previous owner had been grazing 21 heifers there.

---

[1] At our invitation, the Department of Land Conservation and Development (DLCD) submitted a brief as *amicus curiae* addressing the validity of OAR 660-033-0030(5). DLCD asserts that that rule is valid as consistent with Goal 3.

In 2004, petitioner applied for plan and zone amendments to change the designation of the property to non-resource land and to zone it "rural residential 5-acre" (5R). In its findings in support of the plan and zone amendments, the county stated:

"Due to the degradation that had occurred in the past 20 years, it would take 30 years of pasture maintenance and improvements to return the subject property to the limited productivity it had in the 1960's and 1970's; until then, the property's carrying capacity is on the order of 20 head [of cattle]. The subject property is not able to support stock grazing in sufficient numbers without heavy supplemental feeding, pasture maintenance, and regular fertilization so as to yield a profit."

The county rendered findings regarding whether the proposed amendments complied with Goal 3. Goal 3 is "[t]o preserve and maintain agricultural lands." As pertinent to our present review, that goal defines "agricultural land" in western Oregon as land consisting of

"predominantly Class I, II, III and IV soils * * * as identified in the Soil Capability Classification System of the United States Soil Conservation Service, and other lands which *are suitable for farm use* taking into consideration soil fertility, suitability for grazing, climatic conditions, existing and future availability of water for farm irrigation purposes, existing land-use patterns, technological and energy inputs required, or accepted farming practices."

(Emphasis added.) Of critical importance in this case, Goal 3 also defines "farm use" as meaning "as set forth in ORS 215.203." ORS 215.203(2)(a) provides, in part:

"As used in this section, 'farm use' means the current employment of land for the primary purpose of obtaining a profit in money by raising, harvesting and selling crops or the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof."[2]

---

[2] At the time that Goal 3 was enacted, that definition contained a somewhat different description of farm uses, and also simply referred to "purpose" rather

In its findings addressing the applicability of Goal 3, the county stated that "78% of the subject property is comprised of soils in the NRCS Classes VI-VIII. The subject property does not meet the definition of agricultural land under OAR 660-033-0020(1)(a)(A)," *i.e.*, lands classified pursuant to NRCS as "predominantly Class I-IV soils in Western Oregon."

The county then turned to the question whether the subject property nonetheless qualified as "agricultural land" under OAR 660-033-0020(1)(a)(B), which provides that "agricultural land" includes:

> "Land in other soil classes that is suitable for *farm use as defined in ORS 215.203(2)(a)*, taking into consideration soil fertility, suitability for grazing; climatic conditions; existing and future availability of water for farm irrigation purposes; existing land use patterns, technological and energy inputs required; and accepted farming practices[.]"

(Emphasis added.) Noting that ORS 215.203(2)(a) refers to "farm use" as an employment of land "for the primary purpose of obtaining a profit in money" by conducting various farming practices, the county relied on an expert opinion by an agricultural consultant that the subject property was poorly suited for grazing or haying with a view to making a profit in money, although it could support cattle as a "lifestyle activity." The county went on to note that the inherently infertile nature of the soils on the property cannot practicably be corrected, with an intent to make a profit, given the "unproductive droughty soils, lack of irrigation water, difficult topography, and deferred maintenance needs of pasture and improvements."

The county further concluded that the subject property was not "agricultural land" within the definition of OAR 660-033-0020(1)(a)(C) because it was not "necessary to permit farm practices to be undertaken on adjacent or nearby

---

than "primary purpose." Goal 3 has been amended and readopted several times since those legislative changes were made to the statutory definition of "farm use." Thus, the parties assume, and we agree, that the reference to the statute in Goal 3 is to whatever version of the statute existed when the statute was readopted. We do not understand any party to suggest that any of the wording changes to the definition of "farm use" calls into question our case law on the subject, which is discussed in detail below.

lands," noting that nearby farms were self-sustaining and had no connection to the subject property while other nearby lands were in use for "lifestyle farming." Finally, the county concluded that the property was "not located within a farm unit," apparently in reference to OAR 660-033-0020(1)(b), which includes within the definition of "agricultural lands" certain land with soil types other than Class I-IV if it is "within a farm unit[.]"

The county also rendered findings regarding the applicability of Goal 4.[3] In those findings, the county relied on a study by a consulting forester than indicated that few trees had been present on the property since at least 1950, that most of the property had the capability of supporting only poor timber growth, and that no commercial timber operator would be interested in attempting to grow timber on the parcel. Finally, the county noted that the comprehensive plan "employs a standard of 80 cubic feet of wood fiber per acre per year for identifying commercial forestry lands in the county" and concluded that the parcel could not produce that amount. As noted, the county approved petitioner's application.

Friends appealed to LUBA, arguing that the county had erred in concluding that (1) the parcel did not qualify as "agricultural land" under OAR 660-033-0020(1)(a)(B) or (C), or OAR 660-033-0020(1)(b); and (2) the parcel is not "forest land" within the meaning of Goal 4.

LUBA sustained Friends' challenge (discussed in detail below) based on OAR 660-033-0020(1)(a)(B). In so concluding, LUBA relied, in part, on OAR 660-033-0030(5)—

---

[3] Goal 4 is

"[t]o conserve forest lands by maintaining the forest land base and to protect the state's forest economy by making possible economically efficient forest practices that assure the continuous growing and harvesting of forest tree species as the leading use on forest land consistent with sound management of soil, air, water, and fish and wildlife resources and to provide for recreational opportunities and agriculture."

That goal further defines forestland as including

"lands which are suitable for commercial forest uses including adjacent or nearby lands which are necessary to permit forest operations or practices and other forested lands that maintain soil, air, water and fish and wildlife resources."

a rule not relied on by the county and not cited by the parties before LUBA. OAR 660-033-0030(5) provides:

"(5) Notwithstanding the definition of 'farm use' in ORS 215.203(2)(a), profitability or gross farm income shall not be considered in determining whether land is agricultural land or whether Goal 3, 'Agricultural Land,' is applicable."

In invoking OAR 660-033-0030(5) *sua sponte*, LUBA held that the county had erred in considering the subject property's profitability (or lack thereof) in determining whether the property was "suitable for farm use" within the meaning of OAR 660-033-0020(1)(a)(B). Accordingly, LUBA directed a remand to the county "to apply the correct standard, consistent with OAR 660-033-0030(5)."[4]

On judicial review, petitioner argues, principally, that LUBA's determination regarding the application of Goal 3 to the subject property was based on an erroneous premise that the property's actual or potential "profitability" was immaterial to that inquiry. More particularly, petitioner contends that LUBA's reliance on OAR 660-033-0030(5) was erroneous because that rule is invalid as irreconcilable with Goal 3. That conflict arises because (1) Goal 3, in defining "agricultural land," refers to suitability for "farm use" and explicitly incorporates the definition of "farm use" in ORS 215.203(2)(a)—*viz.*, the employment of land "for the purpose of obtaining a profit in money by" engaging in various agricultural activities; but (2) OAR 660-033-0030(5) specifically directs that "[n]otwithstanding [that statutory] definition of 'farm use,'" which is explicitly incorporated into Goal 3's operative definitions, "profitability or gross farm income *shall not be considered* in determining" whether land is "agricultural land" for purposes of Goal 3 (emphasis added).

---

[4] With respect to Friends' Goal 4-based challenge, LUBA determined that the county had misconstrued its comprehensive plan as establishing a standard of 80 cubic feet of wood fiber per acre per year for determining whether land is suitable for commercial forest uses. As noted, *see* 204 Or App at 734, we have rejected petitioner's assignment of error challenging that determination. LUBA also rejected Friends's challenges based on OAR 660-033-0020(1)(a)(C) and (1)(b). As noted, 204 Or App at 734, we have also rejected assignments of error in the cross-petition challenging those rulings.

Friends responds that petitioner failed to preserve any claim of error because it did not raise OAR 660-033-0030(5) before LUBA, much less argue that it was invalid. Friends further argues that, in any event, the rule is valid, and LUBA applied it correctly in this case.

■    We first address preservation. The question of whether the subject property is "agricultural land" subject to Goal 3 has been at issue throughout these proceedings. It does not appear that, in litigating the matter, the parties (or the county) ever referred to OAR 660-033-0030(5) until LUBA invoked that rule *sua sponte*.

That history does not, however, preclude petitioner's present challenge. Rather, once LUBA invoked that rule as a basis of decision, petitioner was entitled to dispute the rule's proper construction and applicability, including by contending that the rule is inapplicable because it is invalid. Indeed, that ability by a party in petitioner's position would seem to be the logical corollary to our obligation (and, presumably, LUBA's) to notice and apply applicable statutes and rules even if the parties have failed to do so. *See Miller v. Water Wonderland Improvement District*, 326 Or 306, 309 n 3, 951 P2d 720 (1998). That is, to the extent that an adjudicative entity can (or must) invoke new authority in the first instance on review or appeal, the parties should be entitled to dispute the applicability of that newly noticed authority. We thus conclude that petitioner is not precluded in this judicial review from challenging the validity and application of OAR 660-033-0030(5).

■    We proceed to the substance of petitioner's challenge. Petitioner asserts that, if LUBA is correct that OAR 660-033-0030(5) precludes consideration of either "profitability or gross farm income" in determining whether land is "agricultural land" for purposes of Goal 3, then OAR 660-033-0030(5) is invalid as conflicting with Goal 3. *See, e.g., City of West Linn v. LCDC*, 200 Or App 269, 275, 113 P3d 935, *rev den*, 339 Or 610 (2005) (administrative rule that implements statewide land use planning goal may be held invalid if it departs from the standard expressed in the goal). As explained below, we agree with petitioner that the rule is invalid and, consequently, we conclude that the case must be

remanded to LUBA to modify the scope of its remand to the county regarding the possible application of Goal 3 to the subject property.

We note, at the outset, that, since its promulgation in 1982, we have never cited, much less applied, OAR 660-033-0030(5). It is essential, then, to put the rule into the historical context of the development of Oregon's land use protections.

Goal 3 ("Agricultural Lands") was promulgated by LCDC in 1975.[5] "Agricultural land," as defined for purposes of the goal, includes lands in western Oregon that are not comprised predominantly of Class I-IV soils but are "suitable for farm use" taking into consideration various criteria. As noted, *see* 204 Or App at 735, the goal itself explicitly defines "farm use" by reference to ORS 215.203—and, in turn, the version of ORS 215.203 in effect in 1975 defined "farm use" as the employment of land "for the purpose of obtaining a profit in money" by engaging in various agricultural activities. ORS 215.203(2)(a) (1973).

ORS 215.203 long antedated the adoption of Goal 3. In *Rutherford v. Armstrong*, 31 Or App 1319, 572 P2d 1331 (1977), *rev den*, 281 Or 431 (1978), we recounted the statute's history, purpose, and application. There, the issue was whether a county had correctly permitted a variance from its comprehensive plan to allow a single-family residence to be built on a five-acre parcel in an area zoned for agricultural use that did not permit residences on parcels of less than 20 acres. *Id.* at 1321. A county ordinance allowed such variances if they were consistent with the provisions of ORS 215.213, which, in turn, provided for residential dwellings in agricultural zones if certain conditions were met, including conditions that the parcel was generally unsuitable for production of farm crops and livestock. *Id.* at 1322. Although the parcel at issue contained Class II soils, the county found that it nonetheless was not suited for economic production of farm

---

[5] Goal 3 provides that it is consistent with the state's agricultural land use policy expressed in ORS 215.243. ORS 215.243, which has not been altered since its adoption in 1973, sets forth a policy of conserving agricultural lands as aesthetic and economic assets, of maintaining an agricultural economy, and of limiting urban development into rural areas.

crops and livestock, because it was too small to be an "economic unit." *Id.* at 1323. The county considered the size of the parcel to be a valid consideration in light of the farm use definition in ORS 215.203(2)(a) that contained the phrase "for the purpose of obtaining a profit in money[.]" *Id.* at 1324. That is, the county determined that a five-acre parcel could not support an economically self-sufficient farm unit. *Id.*

The trial court, on writ of review, sustained the county's decision. We reversed. In rejecting the county's approach, we stated:

"[W]hile the county's interpretation of the definition of 'farm use' and 'accepted farming practice' in ORS 215.203(2) may seem plausible, it is inconsistent with the legislative and judicial history of the statute. In 1961, the legislature enacted the first farm use zoning law which provided that when the land was zoned exclusively for farm use by a county pursuant to ORS 215.010 to 215.190, the property was to be taxed 'at its true cash value for farm use and not at true cash value * * *.' Oregon Laws 1961, ch 695. The statute further provided that property subject to the act would include 'any tract of five acres or more' being used for agricultural purposes. Oregon Laws 1961, ch 695. The Act was subsequently amended in 1963 and 1965, and in 1967 the criteria of 'obtaining a profit in money' was added to the definition of farm use. The 1967 amendment went on to provide: 'Farm use lands shall not be regarded as being used for the purpose of obtaining a profit in money if the *whole parcel has not produced a gross income from farm uses of $500 per year. * * *'* (Emphasis supplied.) Oregon Laws 1967, ch 386. A farm that earns only $500 per year could hardly be classified as economically self-sufficient. Thus, the implication is that the legislature intended that ORS 215.203 apply to any agricultural land that would produce a profit of $500.

"These statutes were again amended in 1969. In 1973 the $500 profit test was eliminated and ORS 215.203 was amended to take the form relevant here. * * *

"* * * * *

"The Oregon Tax Court has also taken the position that farm use as defined in ORS 215.203 includes any land capable of profitable agricultural production regardless of its size."

*Rutherford*, 31 Or App at 1325-26. Ultimately, we concluded that "[t]he fact that the property cannot be farmed as an economically self-sufficient farm unit is irrelevant if it is otherwise suitable to produce farm crops and livestock." *Id.* at 1327.

We next considered the "farm use" definition from ORS 215.203(2)(a) in *1000 Friends v. Benton County*, 32 Or App 413, 575 P2d 651, *rev den*, 284 Or 41 (1978). That case concerned a county's approval of subdivision of several large parcels that had been used predominantly for grazing. The county concluded that the land was not highly productive and that few of the farms in the area were economically self-sufficient. It approved the subdivision of the parcels into multiple units of approximately 20 to 30 acres each, finding that those parcels would be "large enough to permit small farming and gardening or grazing of a few animals or livestock." 32 Or App at 416. The trial court dismissed writs of review challenging the county's action as violating Goal 3. *Id.* at 415.

On appeal, we reversed. In addressing the petitioners' arguments regarding the county's alleged noncompliance with Goal 3, we noted that the definition in ORS 215.203(2)(a), which Goal 3 expressly incorporated, contained the phrase "current employment of land * * * for the purpose of obtaining a profit in money." *Id.* at 425. We further noted, referring to the history recounted in *Rutherford*, that the "current employment" language pertained to property tax relief afforded under concurrently enacted statutes.[6] In context, Goal 3 was concerned "with both existing and future land uses." *Id.* We thus concluded that Goal 3 "must be addressed if any of the lands are capable, now or in the future, of being 'currently employed' for agricultural production 'for the purpose of obtaining a profit in money.'" *Id.* at 426 (quoting ORS 215.203(2)(a)).

---

[6] We explained:

"These statutes were enacted together with ORS 308.345 to 308.403 as a legislative program to provide property tax relief for certain farm lands. Because they are taxation statutes the primary emphasis is on the 'current employment of the land' so that status may be determined for taxation purposes."

*1000 Friends*, 32 Or App at 425 (citation omitted).

We also addressed the meaning of "profit" in ORS 215.203(2)(a). We concluded that "profit" meant "gross income," and nothing more:

> "The legislative history of ORS 215.203 indicates that the use *of the term 'profit' in that statute does not mean profit in the ordinary sense, but rather refers to gross income* inasmuch as this was the test under the former $500 standard and is the present statutory standard for unzoned farm land. Since the legislature did not specify a gross dollar amount required for lands to qualify for exclusive farm use zones under ORS 215.213, it intended that this be a matter of discretion for the counties. LCDC may as part of its goals impose limits on that discretion. Thus, if the lands meet the definition of 'agricultural lands' as provided in Goal 3, and are capable of current employment for agricultural production for the purpose of earning money receipts, Goal 3 is applicable and the county is required to address the considerations set forth in the operative provisions of that goal."

*Id.* at 429 (emphasis added).

In sum, our construction in *1000 Friends* of "current employment of land * * * for the purpose of obtaining a profit in money," as incorporated by reference into Goal 3, rested on two curious, perhaps counterintuitive, predicates. First, "current" employment of land connotes the capability, "now or *in the future*, of being 'currently employed' for agricultural production." 32 Or App at 426 (emphasis added). Second, "profit" means "gross income." *Id.* at 429. *See also Flury v. Land Use Board*, 50 Or App 263, 271 n 4, 623 P2d 671 (1981) (county's finding that ranch was not a self-supporting economic unit was not sufficient to support change to nonfarm use, where the land was "clearly capable of 'current employment for agricultural production for the purpose of earning [gross] money receipts' " (quoting *1000 Friends*, 32 Or App at 429)).

In *Meeker v. Board of Comm'rs*, 36 Or App 699, 585 P2d 1138 (1978), *aff'd*, 287 Or 665, 601 P2d 804 (1979), we again considered the propriety of a subdivision of agricultural lands in light of Goal 3. In that case, the county found

that subdividing a large farm parcel that was not "economically viable" into several smaller farm parcels would facilitate greater agricultural usage. 36 Or App at 703.[7] The county relied on evidence that the smaller farm parcels supported "part-time" farming and could "produce food for home consumption and a small profit, but they do not provide enough income to support a family." *Id.* at 705. In the ensuing writ of review proceeding, the trial court sustained the county's decision.

We affirmed. In rejecting an argument that the sort of small-scale, part-time farms created by the subdivision were incompatible with Goal 3, we cited in passing to *Rutherford* for the proposition that "farm use" under ORS 215.203 did not require a farm to be economically self-sufficient "as long as it is capable of profitable agricultural production," 36 Or App at 706 n 6. We concluded that, even assuming that Goal 3 "requires that minimum lot sizes in an EFU zone be such as will maximize agricultural production, as opposed to merely accommodating agriculture, that standard has been met in this case." *Id.* at 707.

The Supreme Court affirmed, following a similar rationale but avoiding reliance on the definition of "farm use" under ORS 215.203(2)(a), noting that substantial evidence supported the conclusion that the proposed division would provide for greater agricultural utilization of the land. *Meeker v. Board of Commissioners*, 287 Or 665, 677-78, 678-79 n 6, 601 P2d 804 (1979). While *Meeker* was pending, the legislature amended ORS 315.203(2)(a) to change the phrase "for the purpose of obtaining a profit in money" to "for the *primary* purpose of obtaining a profit in money." Or Laws 1979, ch 480, § 1 (emphasis added). In a concurring opinion, Justice Holman noted that change and made the following comments:

---

[7] We explained the county's rationale as follows:

"The Board concluded that full-time farming on the parcel was not economically viable and that subdividing it into smaller, part-time farms would promote more intensive farming and greater overall production than would the maintenance of larger, nonremunerative, idle farm plots."

*Meeker*, 36 Or App at 702.

"The selling of surplus products over those needed for family use in such a situation is, in my opinion, not the use of land 'for the *purpose* of obtaining a profit.' (Emphasis mine.)[1] The purpose of the use of the property is for residence purposes while 'working out' and to raise food for home consumption. The sale of any surplus is incidental and not the use of the land 'for the purpose of obtaining a profit in money.' There is no testimony that the small tracts could ever be operated profitably. To make the matter even clearer, the 1979 Legislature amended ORS 215.203(2)(a) by the insertion of the word 'primarily' in front of the just quoted words. To the statutory criteria is added the requirement of LCDC's Goal 3 that the land's use be part of a 'commercial agricultural enterprise.' While this term is used in reference to the total existing agricultural enterprise, including processing and marketing, it shows LCDC's intention as to the extent of the agricultural use which it contemplates.

"When the above is coupled with the stated purpose of preserving agricultural land in 'large blocks,' the conclusion that the approval of such a plan as the present one was contemplated by either the legislature or LCDC, in my opinion, cannot logically follow. The subdividing of land as suggested here is an irreversible process. After the homes are built the land can never be converted to 'commercial agriculture' or 'open space.' It is difficult for me to see how the legislature and LCDC could have worded *general* statutes and regulations to more clearly show that they would disapprove of the use contemplated here.

"I concur in the majority opinion only because all concerned have steadfastly refused in the face of invitation to raise the issue whether the anticipated use here is 'farm use.'

---

"[1]  I realize that a profit does not necessarily have to be made, only that the property be occupied for that purpose."

*Meeker*, 287 Or at 680-81 (Holman, J., concurring) (emphasis in original).

In 1982, LCDC adopted the original antecedent of the current OAR 660-033-0030(5)[8] including the crucial language: "Notwithstanding the definition of 'farm use' in ORS

---

[8] That rule originally was promulgated at OAR 660-05-010(3).

215.203(2)(a), profitability or gross farm income shall not be considered in determining whether land is agricultural land[.]"

Friends and *amicus* DLCD assert that OAR 660-033-0030(5) is entirely consistent with Goal 3 and, in essence, codifies the holdings of *Rutherford* and *1000 Friends.* Conversely, petitioner asserts that OAR 660-033-0030(5)'s preclusion of any consideration of profitability or gross income in determining whether land is agricultural land is directly contrary to the language of Goal 3, is inconsistent with the Oregon Supreme Court's decision in *Meeker,* and does not comport with the manner in which the Oregon Tax Court interprets the definition of "farm use" found in ORS 215.203(2)(a). *See, e.g., Everhart v. Dept. of Rev.,* 15 OTR 76, 79-82 (1999) (interpreting term "profit" as used in ORS 215.203(2)(a) to mean the measure of "operating expenses against operating income").

As an initial matter, we do not agree with petitioner that the Oregon Supreme Court's majority decision in *Meeker* bears on the issues raised here. The court in *Meeker* specifically declined to address the "farm use" definition in ORS 213.203(2)(a), 287 Or at 678-79 n 6, opting, instead, to base its analysis on the "commercial agricultural enterprise" aspect of Goal 3. *Id.* at 674-75. Further, with respect, *Everhart* and other decisions of the Oregon Tax Court are of limited assistance in analyzing the land use issue presented here. Those decisions addressed whether certain properties were eligible for special tax treatment, and *former* ORS 308.370 cross-referenced the "farm use" definition found in ORS 215.203(2)(a).[9] That is, those decisions concerned how properties were being used, whereas Goal 3 concerns whether lands are suitable for farm use, and encompasses both "existing *and future*" needs. (Emphasis added.) *See 1000 Friends,* 32 Or App at 425.

■       Thus, the fundamental precedent for the issue presented here is our own case law—in particular, *1000 Friends.* As noted above, in that case, we concluded that the "profit in

[9] ORS 308.370 was repealed in 1999. Or Laws 1999, ch 313, § 94. Currently ORS 308A.056 contains its own definition of "farm use" that differs somewhat from that contained in ORS 215.203(2)(a).

money" language from ORS 215.203(2)(a), as incorporated by reference into Goal 3, "does not mean profit in the ordinary sense, but rather refers to gross income[.]" *1000 Friends*, 32 Or App at 429.[10] Although petitioner does not squarely challenge that holding in *1000 Friends*, it does so implicitly, given its assertions that "profit," for purposes of ORS 215.203(2)(a) as incorporated into Goal 3, means income minus operating expenses. That is, petitioner contends that "profit" in ORS 215.203(2)(a) means *net* profit—a position we flatly rejected in *1000 Friends*. Under the doctrine of *stare decisis*, we adhere to our prior decisions unless error is plainly shown to exist. *See Newell v. Weston*, 156 Or App 371, 380, 965 P2d 1039 (1998), *rev den*, 329 Or 318 (1999). We conclude that *1000 Friends*, which relied in part on *Rutherford* for its conclusion concerning the meaning of "profit," is not plainly wrong. Accordingly, we adhere to its construction of ORS 215.203(2)(a).

Our adherence to *1000 Friends* yields two dispositive conclusions in this case. *First*, OAR 660-033-0030(5) is invalid as conflicting with Goal 3 insofar as it precludes consideration of either "profitability *or* gross farm income" in determining whether land is "agricultural land." The rule's exclusion of consideration of "gross income" is directly at odds with our holding in *1000 Friends* that Goal 3's incorporation of ORS 215.203(2)(a)'s "farm use" definition includes "profit in money," which means "gross income." 32 Or App at 429.[11]

■ *Second*, notwithstanding the invalidity of OAR 660-033-0030(5), LUBA is correct—albeit for a different reason—that the county's determination that the subject property is not "agricultural land" must be remanded for reconsideration. The county based that determination on its assessment of the likelihood of the property yielding a "profit," in the sense of income exceeding expenses. That is, the county

---

[10] While we relied on our earlier decision in *Rutherford* for that conclusion, *Rutherford* did not explicitly address Goal 3 and thus is not direct precedent for the issue at hand.

[11] To the extent that the reference in OAR 660-033-0030(5) to "profitability" is understood to mean profitability in the traditional sense of income minus expenses, the rule's preclusion of consideration of "profitability" comports with *1000 Friends*, which also excludes consideration of "profitability" in that sense. *See 1000 Friends*, 32 Or App at 429.

determined that the subject property was no longer "agricultural land" protected under Goal 3 because the property, due to its lack of maintenance over the past 20 years, could currently sustain only "lifestyle" farming rather than commercial farming. *See* 204 Or App at 736-37 (recounting pertinent findings). The county did not consider, as it must under *1000 Friends*, whether the property yielded, or reasonably could yield, "gross income."

LUBA, however, specifically directed the county on remand to reconsider the issue in light of OAR 660-033-0030(5). For that reason, we must remand this matter to LUBA so that it may recraft its remand instructions to the county in light of our conclusion that OAR 660-033-0030(5) is invalid insofar as it precludes consideration of "gross income."[12]

On petition, remanded for reconsideration of scope of LUBA's remand to county regarding Goal 3 and OAR 660-033-0020(1)(a)(B); otherwise affirmed; on cross-petition, affirmed.

---

[12] Our analysis and disposition obviates the need to address the parties' remaining arguments concerning "farm use" under OAR 660-033-0020(1)(a)(B).